MANOR *v*. MANOR ET AL.

[No. 27,966.   Filed March 7, 1944.   Rehearing denied April 3, 1944.]

*Richard Ewbank*, of Indianapolis, *Robert L. Smith*, of Portland, and *John J. Dodd* and *George H. Koons*, both of Muncie, for appellant.

*Moran & Abromson* and *Frank B. Jaqua*, all of Portland, for appellees.

RICHMAN, J.—Ella Manor died October 23, 1921, leaving surviving her husband, William W. Manor, a daughter, Mrs. Mauller, and appellant, a minor, the only heirs at law. The widower qualified as administrator of the estate giving bond with Clement L. Arthur and Gilf H. Jones as sureties. November 8, 1924, the administrator's final report was heard and it was "adjudged by the Court that said estate is fully and finally settled and determined, that said report and acts of said administrator in the premises be and they are approved and confirmed and he is discharged and released from further liability in the premises." No guardian had then been appointed for appellant, he was not served with personal summons, nor did he attend the hearing. August 8, 1936, and within a year after attaining his majority, appellant filed in the same court a petition to set aside the final settlement. The cause was venued to Randolph County where a second paragraph of petition was filed. Upon answer in general denial there was a trial in April, 1939, before a special judge who made a general finding and entered judgment thereon for the defendants. This appeal followed. The defendants were appellant's father individually and as administrator, his sister and the two sureties on his bond, one of whom died pending the appeal which is the occasion for naming as appellees his heirs and "unknown" personal representatives. Both paragraphs of the petition seem to be grounded upon § 6-1424, Burns' 1933, § 3220, Baldwin's 1934,

which provides that "any person interested in the estate, not appearing at the final settlement, nor personally summoned to attend the same, may have such settlement, or so much thereof as affects him adversely, set aside, and the estate reopened, by filing in the court in which the settlement was made, within three (3) years from the date of such settlement, his petition, particularly setting forth the illegality, fraud or mistake in such settlement, or in the prior proceedings in the administration of the estate, affecting him adversely . . . ." The statute further provides that one under legal disability may file his petition within three years from the time of the removal of the disability. .It is claimed by appellees that in the trial appellant relied upon fraud to set aside the final settlement. The briefs of appellant apparently take the position that he had the right to disregard the order of final settlement and "to file exceptions to the final report, and have it" (the final report) "set aside if not entirely according to law." *Crum, Administrator* v. *Meeks* (1891), 128 Ind. 360, 27 N. E. 722, is cited as authority. It does not so hold. The order approving the final report and discharging the personal representative has, except as hereinafter stated, the same finality as any other judgment. An appeal will lie therefrom. It cannot be collaterally attacked. See *Heitman, Rec.* v. *Scales* (1942), 111 Ind. App. 68, 38 N. E. (2d) 890. It is somewhat analogous to a judgment on default in a civil case. See *Emmerling, Etc.* v. *James C. Curtis & Co.* (1937), 103 Ind. App. 139, 5 N. E. (2d) 677. So long as it stands, the final report and the prior proceedings may not be reviewed except by appeal. This is stated in substance in § 6-1423, Burns' 1933, § 3219, Baldwin's 1934, but would we think be true without such statement. *Crum* v. *Meeks, supra,* does hold that

under § 6-1424, a person interested may have the settlement set aside if it affects him adversely, for any of the causes therein specified. But until the settlement is set aside certainly no exceptions can be filed to the final report.

It would be futile to open up the judgment to correct mistakes of fact, errors of law or even to expose fraud if the petitioner was not adversely affected by the proceedings which culminated in the judgment. This is the fair implication from the statute. So the Appellate Court stated in *Heitman, Rec.* v. *Scales, supra.* We think it follows that the petitioner had the burden of showing that he was denied some substantial property right by what, for the purpose of this case, we may call the irregular proceedings.

The only error assigned is the overruling of appellant's motion for new trial which presents two questions, the insufficiency of the evidence to sustain the decision and the refusal of the court, some months after the taking of the evidence had been concluded and while the trial judge had the matter under advisement, to permit other newly discovered evidence to be introduced. It appears from the record that this evidence was available at the time of the hearing, that it was cumulative only, and under the circumstances we cannot hold that the trial judge abused his discretion.

Following the usual rule we shall consider the evidence stated most favorably in support of the decision. As background it appears that Mrs. Manor owned over 400 acres of land in Jay County and that she and her husband as tenants by the entirety owned another farm of 55.60 acres purchased in 1911 for $6,265.00. When they were married he had no property. At the time of

her death the daughter, Mrs. Mauller, was 21 years old and the son, appellant, seven years old. Mr. Manor conducted the farm operations and bought and sold live stock, carrying the family bank account in his own name and borrowing money from time to time upon notes signed by himself, if the amounts were small, and also by his wife if the amounts were sizeable. There seems to have been little attempt to keep the personal property separate and he considered it to be his own. Tax assessment sheets were introduced showing that all the personal property was listed in his name.

The inventory shows as personal assets of her estate items of a total value of $1,998.00, including two certificates of deposit, two Liberty bonds and two notes. In his final report the obligations of the estate were listed in the total sum of $5,257.99 and the assets $1,998.00, leaving "an excess paid by administrator $3,259.99" which was explained in the report by this statement: "The excess paid by the administrator in the excess of the amount received, was paid to him by heirs at law of decedent, $3,259.99." The final report also discloses that the administrator had paid into the estate $100.00, the face of one of the notes listed in the inventory, the makers of which were said to be insolvent. Of the credits claimed all except three amounting to $567.45 were attacked as erroneous. The claim that one item for $21.80 was costs in litigation for which he personally was responsible seems unsupported by any evidence. Items for medical, burial, grave and monument expenses totaling $2,318.00 we shall assume were erroneously charged against the estate when they should have been borne by the surviving husband. The other two items were notes payable to banks, one in the sum of $750 and the other $1,600.

The dates of the loans and their purpose does not appear. There is negative evidence that the larger note was not listed in the bank's register of notes found by the clerk of the court among the records of the receivership of that bank which had been liquidated. While there was some evidence that certain of the vouchers for medical and grave expenses filed with the final report were signed by Mr. Manor in the names of the creditors there was no attack upon the vouchers evidencing the payment of the two notes. Mr. Manor testified that his wife did not owe the $1,600 note. Of his testimony, however, as of much of the other testimony, the court may reasonably have concluded that after fifteen years a personal recollection was not very reliable, and may have given more consideration to the sworn report and the voucher. Circumstances from which the court could have drawn the inference that the $750 note was Manor's personal obligation do not require reversal of the judgment if in fact the court drew the opposite inference on conflicting evidence and particularly if its allowance as a credit did not harm appellant. There was testimony as to the presence of harvested crops and some livestock upon the farm when Mrs. Manor died but the ownership thereof was not proved nor was its value. A former neighbor testified that in the spring before Mrs. Manor died she exhibited Liberty bonds of the face value of $3,000 and said that they were her own. On cross-examination the witness was certain of nothing except that she saw some Liberty bonds. There was evidence that decedent received from her mother's estate two $500 Liberty bonds. The administrator accounted for two such bonds. If she had more they may have been sold before her death. There was no evidence that she then owned more than were listed. A brother-in-law, from a somewhat hazy

recollection, testified that he paid Mr. Manor about $500 to take care of a note executed to the mother-in-law and turned over to Mrs. Manor, who with his own wife, were the sole heirs, in their division of the assets of the mother-in-law's estate. If this story was accepted as credible, which we doubt, it did not necessarily indicate loss to appellant.

William H. Duggan filed as a claim against the estate a note in the face amount of $1,000 bearing the signatures of wife and husband in the order named. This claim remained upon the allowance docket when the estate was settled. From testimony of Mrs. Duggan, the widow of the payee, the court could have inferred that the obligation was Mrs. Manor's. There was testimony that Manor paid it after settlement of his wife's estate.

Mrs. Mauller said that she paid no part of the $3,259.99 and of course the seven-year-old boy made no such contribution. Mr. Manor was asked about it but his testimony was somewhat confused. We think, however, the court may reasonably have drawn the inference that the whole sum was paid by him. If to it be added the $1,000 which Duggan's son testified was paid after the death of his father and the face of the uncollectible $100 note, Mr. Manor contributed of his personal funds $4,359.99. Considering the lack of certainty of most of the testimony and bearing in mind the fact that the trial court was confronted by the witnesses and had the best opportunity to weigh the credibility of the testimony the result reached may be readily explained in that he concluded that the amount contributed by the surviving husband more than offset any charges which he as administrator erroneously made plus the value of any property which he erroneously failed to include in the

inventory.  See *McKee* v. *Mutual Life Insurance Company of New York* (1943), *ante* p. 10, 51 N. E. (2d) 474.

It should be noted that appellant was entitled only to one-third of the personal estate and that only one-third of the credits which he asserts were illegally taken by his father were chargeable against appellant.  Mrs. Mauller, who was of age when her mother died, so far as the record appears made no complaint and is not now complaining of her father's administration of the estate.  She was asked as a witness to identify as her father's several signatures to vouchers.  One only was positively identified.  There is no contention that he did not pay this bill.  His signing a voucher for the payment cannot be approved but appellant was not harmed.  His father testified that he did not intentionally make any misrepresentations.  If appellees had lost below we would have difficulty in finding evidence of fraud to sustain the decision. The administrator was a farmer and his lawyer, now deceased, was practicing in a country town.  There were irregularities and, as we have assumed, illegality in his charges against the estate for medical and other expenses which he should himself have paid but the evidence warrants the trial court's inference that appellant was not adversely affected by the final settlement and accordingly the judgment is affirmed.

NOTE.—Reported in 53 N. E. (2d) 343.